**PANATION TRADE CO.**

v.

**UNITED STATES.**

C.D. 3802; Protest Nos. 67/85497–49809–67.

United States Customs Court,
First Division.

April 24, 1969.

Barnes, Richardson & Colburn, New York City (James S. O'Kelly, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Owen J. Rader and Patrick D. Gill, trial attorneys, New York City), for the defendant.

Before WATSON, MALETZ and RE, Judges.

MALETZ, Judge:

This case involves the proper tariff classification of articles imported from West Germany which were described on the invoice as "aluminum anodized * * religious medals." The articles were classified by the government under item 740.37 of the Tariff Schedules of the United States, as amended, as jewelry and other objects of personal adornment, and assessed with duty at 55 percent ad valorem.

Insisting that this classification is erroneous, plaintiff claims that the articles are properly classifiable under item 740.60 as religious articles of a purely devotional character, dutiable at 20 percent ad valorem.

The statutes involved are contained in schedule 7, part 6, subpart A of the tariff schedules. They are as follows:

*Subpart A headnotes:*

\*   \*   \*   \*   \*   \*   \*   \*

2. For the purposes of this subpart—

(a) the term "jewelry and other objects of personal adornment" * * * includes * * * medals * * * but does not include—

\*   \*   \*   \*   \*   \*   \*   \*

(ii) religious articles of a purely devotional character * * *

*Classified under:*

Jewelry and other objects of personal adornment not provided for in the foregoing provisions of this part * * *:

\*   \*   \*   \*   \*   \*   \*   \*

Valued over 20 cents per dozen pieces or parts:

\*   \*   \*   \*   \*   \*   \*   \*

740.37      Other ........................... 55% ad val.

*Claimed under:*

Religious articles of a purely devotional character designed to be worn on apparel or carried on or about or attached to the person:

740.50      Rosaries and chaplets .............. 15% ad val.
             Crucifixes and medals:

\*   \*   \*   \*   \*   \*   \*   \*

740.60      Other ........................... 20% ad val.

The record in the case consists of the testimony of four witnesses—two for plaintiff and two for defendant—together with three exhibits, one of which was a sample of the importation.[1] Examination of that sample discloses that the importation is a metallic lancet-shaped medal, about one inch in width at the top and about 1¼ inches in length, which resembles in form a miniature medieval English shield of arms. The front of the medal has a black background upon which the following figures are depicted in bas-relief: at the center top, a heart-like figure with a small indentation therein; beneath that, a hand pointing downward; and at the bottom, a dove-like figure with wings widespread, and a ring encircling the head. A small, irregular silver-colored object appears on either side of the heart-like figure, while a scalloped design extends across the top quarter of the medal between the heart-like figure and the hand. The reverse side of the medal is entirely silver-colored and depicts in bas-relief a single figure in long robes with arms outstretched.

Further details concerning the imported medals were supplied by the testimony of the four witnesses—which testimony we now summarize. Plaintiff's first witness identified himself as a partner in plaintiff company for the past 19 years, and indicated that the company imports various religious and devotional articles, such as rosary beads, medals and statuary. As a partner, he said he designs many of the items that are imported by his firm, supervises sales in the United States, and does some selling himself. In addition, he noted that he has visited many cathedrals throughout Europe to study religious art, and has read many books on the subject.

With respect to the imported merchandise, the witness stated that he personally designed the medals and supervised their importation and distribution. He testified that on the front or dark side, the medal depicts the Holy Trinity—the hand representing the Hand of God; the heart representing the Sacred Heart; and the dove representing the Holy Spirit. He added that the irregular object on either side of the heart is basically decorative. The figure on the reverse side of the medal, he testified, represents the Risen Christ.

The witness further testified that the imported medals are sold to various religious stores and shrines throughout the United States which in turn sell the medals to members of the clergy and the religious. Many of the designs of the religious medals imported by plaintiff, he said, come from its customers who deal directly with the clergy. In fact, he testified (on cross-examination) that he designed the imported medals on the basis of a request from one of his customers.

Plaintiff called as its second witness a priest who has been Pastor of the Church of the Sacred Heart of Jesus, New York City, for the past seven years. The witness stated that he has been an ordained priest for 33 years and a Monsignor for the last five years, and that prior to his present pastorate, he was a member of the New York Archdiocesan Mission Band, a society which works throughout the diocese conducting missions and retreats. He is also a member of the Liturgical Mission of the Archdiocese of New York which assists the Archbishop on various liturgical matters, including changing and updating the Mass.

The witness testified that the symbols on the imported medal have special religious significance. The front side of the medal, he stated, depicts the Holy Trinity. The Holy Trinity, he explained, is a mystery of the Catholic religion, which teaches that there is one God, but three persons in God: God the Father, God the Son, and God the Holy Ghost. He testified that the hand on the medal repre-

---

1. A second exhibit is a catalogue of plaintiff illustrating the various articles it imported and sold in the United States.

The third is purportedly a St. Christopher medal and is similar in shape to the imported medal.

sents God the Father; that the heart, especially with the small indentation in it, represents the Sacred Heart or the Son of God; and that the dove represents the Holy Spirit. He further testified that the figure on the reverse side obviously represents the Risen Christ. This figure, he said, has special religious meaning and significance in that the Risen Christ is the cornerstone of the Catholic faith.

The witness stated that religious medals are known as sacramentals of the Catholic Church; that their purpose is to excite pious devotion; and that they are worn as acts of devotion. It is a custom in the Catholic Church, he added, for priests to bless religious medals, and he would consider the imported medal a proper subject for his blessing.

On cross-examination, the witness stated that his testimony represented his personal opinion and also what he understood to be the official position of the Catholic Church. He stated that the symbols or figures on the imported medals are universal symbols that are used within the Catholic Church. He agreed that any one of the symbols on the front of the imported medal could have a different meaning if taken out of context, but, as depicted on the medal, he had no doubt but that they represent the three persons of the Holy Trinity. Asked to define the word "devotional," he replied that it "is a religious expression. It is a word used to connote pious thoughts and aspirations. It is a word that indicates something supernatural. It excites your thoughts to heavenly things."

Further on cross-examination the witness testified that the symbols of the Holy Trinity—Father, Son and Holy Spirit—are easily recognizable to Catholics and on that basis he would consider the medal to be purely devotional. He stated that the purpose of the imported medal is to excite devotion to the Holy Trinity, and that there is no devotion to the medal itself. He indicated that the medal also serves as a form of identification since persons wearing religious medals of this type would ordinarily be Catholics.

Defendant's first witness identified herself as a clerk-stenographer employed by the Customs Section of the U.S. Department of Justice. She testified that she considers herself a devout Catholic but saw no religious significance in the medal. Asked to interpret the representations on the front side, she said "it could even be a shield" and that she saw "a hand and a bird, and some figures at the top." She described the reverse side of the medal as a figure of a man with hands raised "that could be religious."

On cross-examination the witness agreed that the Holy Spirit or the third person of the Blessed Trinity is traditionally pictured or symbolized by a dove. Also, she said that she had seen pictures of the Risen Christ and that the figure on the reverse side of the imported medal was similar to the pictures that she had seen, but that this was not her impression when she first viewed the medal.

Defendant's last witness is also employed by the Customs Section of the U.S. Department of Justice as a secretary-stenographer. She testified that she considers herself a devout Catholic. After examining the imported medal, she testified that it had no religious significance to her, and that the figure on the back side purportedly representing the Risen Christ did not represent the Christ image she was accustomed to seeing but might to someone else.

On cross-examination she agreed that the Holy Trinity is a spiritual being, having no corporal body, and is traditionally symbolized by a dove, a hand and a heart. After further studying the imported medal, she agreed that she could clearly see the hand and the dove, but not the heart.

In this setting, plaintiff's argument is that the imported medals are religious articles of a purely devotional character and are thus properly dutiable under item 740.60. Defendant's position, to the contrary, is that the medals in question are not articles of a purely devotional character but rather are articles of ornamenta-

tion and hence were properly classified by the government under item 740.37 as jewelry and other objects of personal adornment.

■ It is to be noted at the outset that the parties agree—as does the court—that the definition of "devotional" as given by plaintiff's expert witness is appropriate. This is to say that it is a "religious * * * word used to connote pious thoughts and aspirations" and to excite one's thoughts to heavenly things. Also relevant are the following dictionary definitions of the words "purely" and "devotional":

> Funk & Wagnalls New "Standard" Dictionary of the English Language (1956)—
>
>> *purely* adv. 1. In a pure manner. * * * (2) Completely; totally; absolutely * * *.
>>
>> *devotional* a. Of or pertaining to devotion; of the nature of or expressing devotion; devout.
>>
>> *devotion* n. 1. The state of being devoted. (1) Zealous application to any pursuit or practice, especially to religious duties; devoutness. (2) Strong attachment expressing itself in earnest service; ardor; zeal. * * * 2. An expression or act of devotedness or devoutness; especially an act of religious worship * *.
>
> Webster's Third New International Dictionary of the English Language (1963)—
>
>> *purely* adv: without admixture— usually used in combination with an adjective * * *.
>>
>> *devotional* adj: relating to, suited to, used in, or characterized by devotion (as religious devotion) * * *.

It is against this background that we now consider item 740.60 of the tariff schedules. That item (as previously set out) covers religious articles of a purely devotional character but limited to the extent of the four types of religious

articles enumerated thereunder: rosaries, chaplets, crucifixes and medals. By contrast, under prior tariff acts, rosaries and chaplets were provided for by name but contained no specific provision for crucifixes and religious medals.[2] Such articles were classified (as is discussed below) under various "basket provisions" of the tariff act according to materials. In this circumstance, the purpose of the Tariff Commission in drafting schedule 7, part 6A, was to bring together these four types of religious articles under one tariff heading. See Tariff Classification Study, schedule 7, part 6A, p. 324.

The absence of a specific provision for crucifixes and religious medals under previous tariff acts gave rise to a number of cases involving the classification of such articles. E.g., United States v. Closson Co., 12 Ct.Cust.Appls. 470, T.D. 40669 (1925) (crucifixes); Benziger Bros. v. United States, 14 Ct.Cust.Appls. 270, T.D. 41883 (1926) (crucifixes); F. Pustet & Co. v. United States, 8 Treas. Dec. 485, T.D. 25709 (medals). In the *Closson* and *Benziger* cases the issue presented was whether crucifixes were properly dutiable under the provision for "Rosaries, chaplets, and similar articles of religious devotion" in paragraph 1446 of the 1922 Tariff Act. The crucifixes had been classified according to component material of chief value and the importer contended that they fell within the description "similar articles of religious devotion." The court rejected the claim in both cases. In so doing, however, it recognized the fact that a crucifix was a religious article that inspired religious devotion. Indeed, it was on that very basis that the court in *Closson* and *Benziger* held that crucifixes were not similar to rosaries and chaplets. For it found that the purpose of the crucifix is to inspire devotion, whereas rosaries and chaplets are designed to keep a record of the prayers said. As stated

---

2. Paragraph 1446 of the Tariff Act of 1922 and paragraph 1544 of the Tariff Act of 1930 covered "Rosaries, chaplets, and similar articles of religious devotion * * *."

by the court in *Closson* (12 Ct.Cust. Appls. at 471–72):

> \* \* \* [T]he cross and crucifix inspire prayer and religious devotion, whereas rosaries, chaplets and beads of other kinds are designed to keep a reckoning of the prayers said. Crosses, crucifixes, rosaries, and chaplets are all sacred articles in the sense that they are dedicated to a religious use, but the religious use of the one is not the religious use of the other and they are therefore not similar articles.

In Pustet & Co., *supra*, the merchandise was described as Catholic medals composed of precious and base metal. The medals had been classified as articles of jewelry under paragraph 434 of the Tariff Act of 1897, and were claimed dutiable under paragraph 193—the metal paragraph of that act. In a brief opinion, the Board of General Appraisers sustained the protest holding that the medals "were not designed for nor used as ornaments," but were "emblems of religious devotion," and "not commonly known as jewelry." 8 Treas. Dec. at 485.

There is one common denominator in these cases and that is, the nature and subject with which it deals will, in large part, determine whether the article is one of religious devotion. Thus, it could scarcely be argued that a crucifix, as it symbolizes and recalls the death of Christ, is other than a religious article intended to excite devotion. So too with the imported medals here in question. They treat with subjects that are highly religious and sacred to Catholics in particular—the Holy Trinity and the Risen Christ. The Holy Trinity, being a sacred mystery of the Catholic religion, and the Risen Christ, being the "cornerstone" of that faith, are not the type of subjects one expects to find on trinkets. The imported medals clearly are not the kind of articles which are worn or carried on the person for the purpose of adornment or ornamentation. An examination of the sample is alone sufficient to establish that fact. Coupled with this, the great weight of the evidence shows that the medals are religious articles designed "purely" or solely for the purpose of inspiring devotion. Nor, when viewed in context, is the religious character of the medals lessened by the presence of the decorative objects on either side of the heart or by the scalloped design.

Clearly distinguishable is Whittemore Associates, Inc. v. United States, 42 Cust. Ct. 363, Abstract 63004 (1959)—on which defendant places major reliance. The merchandise there involved consisted of a silver chain 16 inches in length, with a small decorated cross attached thereto. It was classified by the collector as jewelry and claimed by the importer to be properly classifiable as an article composed wholly or in chief value of silver. The court sustained the collector's classification, stating (42 Cust.Ct. at 365):

> The article before us in this case is a necklace, with a decorated cross as the pendant. If some form or shape, other than a cross, had been used as a pendant, there would be no dispute that this merchandise is jewelry. That a decorated cross has been used as a pendant, does not *ipso facto* remove the necklace from the category of jewelry. The appearance of the cross may serve to attach religious significance to the wearer of the necklace, but, basically, the article, itself, is one of ornamentation. Plaintiff's witness characterized it as a "very special type of adornment." The bright silver chain with the decorated cross imparts to the complete necklace sufficient ornamental character to bring it within the provision in paragraph 1527(a) (1), as amended, *supra,* for "Jewelry, commonly or commercially so known, finished or unfinished."

In the present case, by contrast, there is nothing about the imported medals which would justify characterizing them as articles of adornment or ornamentation. But even assuming, contrary to the actual situation, that the medals are decorative or ornamental, this would be immaterial here since the record

shows (as we have seen) that they are religious articles of a purely devotional character, and are thus excluded by head-note 2 of subpart A from classification as jewelry and other objects of personal adornment.

■ Nor is there any merit to the contention of defendant—advanced at trial—that "a symbolic representation cannot be of a purely devotional nature, and the only medal which can represent a purely devotional nature can be those of religious personages, or symbols which mean the same thing to everybody." In the first place, if the test for classification as a religious article is recognition by "everybody," the provision would be impossible of application and administration. Secondly, the terms "symbol" and "symbolic," as their dictionary definitions show, are often used to suggest religion and God. Webster's Second New International Dictionary (1960) defines the terms "symbol" and "symbolic" as follows:

> *symbol* 1. An authoritative summary of faith or doctrine; a creed. * * * 2. That which stands for or suggests something else by reason of relationship, association, convention, or accidental but not intentional resemblance; esp., a visible sign of something invisible, as an idea, a quality or totality such as a state or a church; an emblem; as, the lion is the symbol of courage; the cross is the symbol of Christianity.

> *symbolic* 1. Of or pertaining to a symbol or symbols * * *. 2. Using, employing, or exhibiting a symbol or symbols; expressed in symbols; as, symbolic inscriptions, writers, and representations of God * * *.

As God is a spiritual being, it is natural that symbols are used to represent Him. The Holy Trinity is also a spiritual being and must, of necessity, be captured or represented by use of symbols. But that is no reason for saying that symbolic representations of God cannot be purely devotional in character.

There is no basis to conclude that Congress intended to exclude all symbolic representations of God from the provision for religious articles of purely devotional character. The words of the statute will not support such a construction, and neither will logic.

The protest is sustained. Judgment will be entered accordingly.

WATSON and RE, JJ., concur.